UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

JOHN TABOR,

PLAINTIFF,

**CV 11 - 0195**

COMPLAINT

-AGAINST-

**ECF CASE**

NEW YORK CITY, DETECTIVE JAMES ROPENUS,
DETECTIVE MCLAUGHLIN, POLICE OFFICER
SINGLETARY, ASSISTANT DISTRICT ATTORNEY
KEISHA ESPINAL, ASSISTANT DISTRICT
ATTORNEY LAUREN PARSONS, ASSISTANT
DISTRICT ATTORNEY KENNETH APPLEBAUM,
ASSISTANT DISTRICT ATTORNEY MARJORIE
FISHER, DISTRICT ATTORNEY RICHARD BROWN,
AND POLICE COMMISSIONER RAYMOND KELLY,
IN THEIR INDIVIDUAL AND PROFESSIONAL
CAPACITIES.

**BLOCK, J.**

**POLLAK M.**

**SUMMONS ISSUED**

DEFENDANTS.

----------------------------------------------------------------------- x

**PRELIMINARY STATEMENT**

1. This is a civil action in which plaintiff Mr. John Tabor seeks relief for the violation

   of his rights secured by 42 USC 1983, the Fourth, Fifth, and Fourteenth

   Amendments to the United States Constitution.

2. The claims arise from a March 29, 2009, incident in which officers of the New

   York City Police Department and attorneys for the Queens County District

   Attorney's Office ("QCDAO") acting under color of state law, intentionally and

willfully subjected Mr. John Tabor to *inter alia* false arrest and malicious
prosecution.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against
   defendants as an award of costs and attorneys' fees, and such other and further
   relief as this Court deems just and proper.

### JURISDICTION

4. This action is brought pursuant to 28 USC 1331, 42 USC 1983, and the Fourth,
   Fifth, and Fourteenth Amendments to the United States Constitution.

5. Venue is laid within the United States District Court for the Eastern District of New
   York in that Defendant City of New York is located within, and the events giving
   rise to the claim occurred within the boundaries of the Eastern District of New
   York.

### PARTIES

6. Plaintiff, Mr. John Tabor, is a United States citizen and at all times here relevant
   resided at 188-25 Keeseville Avenue, Saint Albans, New York 11412.

7. The City of New York is a municipal corporation organized under the laws of the
   State of New York.

8. Detective James Ropenus, Tax # 929081 ("Detective Ropenus"), and Detective
   McLaughlin, Shield 06360 ("Detective McLaughlin"), Police Officer Singletary
   ("PO Singletary"), and Police Commissioner Raymond Kelly ("Commissioner

Kelly") at all times here relevant were members of the New York City Police Department, and are sued in their personal and professional capacities.

9. Assistant District Attorneys Keisha Espinal ("ADA Espinal"), Loren Parsons (ADA Parsons"), Kenneth Applebaum ("ADA Applebaum"), Marjorie Fisher ("ADA Fisher"), respectively, and District Attorney Richard Brown, ("DA Brown"), at all times here relevant were attorneys at the QCDAO, and are sued in their professional and individual capacities

10. At all times herein, DA Brown, ADA Applebaum, ADA Fisher, as District Attorneys for Queens County, were responsible for making policy for Defendant, The City of New York, with respect to the management of the QCDAO.

11. At all times herein Defendants ADA Espinal, ADA Parson, ADA Applebaum, ADA Fisher and DA Brown acted on behalf of City of New York as municipal policymakers with the granted authority and responsibility to: (a) determine what exculpatory information and records should be gathered and disclosed during the NYPD investigation and prosecution of individuals suspected or accused of crimes; (b) determine what evidence and testimony should be gathered and presented at Grand Jury proceedings, hearings, and trial; (c) ensure that evidence is checked as to its veracity when conflicting accounts or evidence is presented, and the alleged crime scene is inspected and visited; (d) ensure that NYPD criminal investigations are conducted thoroughly and diligently; (e) ensure that witnesses do not commit perjury or provide inaccurate testimony; (f) ensure that NYPD criminal investigations are handled ethically and in accordance with the laws of New York

State and the United States constitution; (g) conduct thorough and diligent investigations to protect the rights of the innocent.

12. At all times herein Defendants Detective Ropenus, Detective McLaughlin, and PO Singletary were responsible for the apprehension of proper criminal suspects; the weighing up of testimonial evidence against alibis; the pursuit and study of physical evidence; the visit and inspection of the alleged crime scene; the provision of accurate information to the QCDAO in relation to prosecution; making further inquiry when reasonable in a criminal investigation, and the full investigation of all witnesses who might have critical evidence.

13. At all times mentioned, defendants were acting under color of state law under color of the statutes, ordinances, regulations, policies and customs and usages of the City of New York.

## FACTUAL ALLEGATIONS

### Mr. Tabor's Life with Ms. Hassan and Aneesha

14. Mr. John Tabor ("Mr. Tabor") is a 54 year old African American male.

15. From on or about 1999 until November 14, 2005, Mr. Tabor lived with Ms. Rashida Hassan ("Ms. Hassan") and her teenaged daughter, Aneesha Hassan, ("Aneesha") in his mother's house, at 188-25 Keeseville Avenue, St. Albans, NY.

16. This house has two small floors and a basement.

17. Mr. Tabor, Rashida, and Aneesha lived on the second floor.

18. Mr. Tabor's mother ("Mrs. Tabor") lived on the first floor.

19. Mr. Tabor moved back into this house in the mid 1990s as his mother, Mrs. Tabor, needed assistance - physical, emotional, and economic- due to her poor health.

20. This house is extremely small with thin walls separating the rooms; all sounds are audible from virtually anywhere in the house.

21. Each floor is approximately 350 square feet.

22. Everyone in the house is able to communicate by talking without raising their voices.

23. Even though Mr. Tabor and Ms. Hassan tried to have intercourse without making noise, it was impossible not to be heard by Mrs. Tabor down below.

24. On occasion, Mrs. Tabor would comment about their love making.

25. Mr. Tabor and Rashida joked about making love like 'mice'.

26. Mr. Tabor and Ms. Hassan have known each other since elementary school.

27. Mr. Tabor helped to raise Aneesha and provided her with financial and emotional support.

28. As Aneesha's stepfather, Mr. Tabor oversaw her school and social activities, and tried to protect her from 'hanging with the wrong crowd'.

29. Mr. Tabor encouraged Aneesha to do her schoolwork, limited Aneesha's evening activities on school nights, and preventing her from staying out late.

30. However, Mr. Tabor and Ms. Hassan frequently received calls from Aneesha's school informing them that Aneesha was missing class.

31. Aneesha's school also sent written notices informing Mr. Tabor and Ms. Hassan that Aneesha was skipping class.

32. Mr. Tabor attended Aneesha's parent-teacher evenings along with Ms. Hassan.

33. The teachers told Mr. Tabor that Aneesha had problems at school and was often truant.

34. The school forced Aneesha to have an attendance sheet signed by her teachers in order to verify that she was attending class.

35. Mr. Tabor checked that Aneesha's attendance sheet was signed by the teachers.

36. On one occasion Mr. Tabor discovered that Aneesha had falsified the attendance sheet and asked Aneesha to explain her actions.

37. Aneesha was livid that Mr. Tabor had caught her lying and complained bitterly to her mother about Mr. Tabor.

38. Aneesha objected to Mr. Tabor's attempt to introduce some discipline to her life and his encouragement to focus on her school work.

39. Mr. Tabor has worked as truck driver for more than 30 years.

40. Mr. Tabor worked as truck driver for Galasso Trucking Inc. from 1998 until 2005.

41. On November 14, 2005, Mr. Tabor was arrested in Connecticut, and subsequently pled guilty to burglary.

42. Mr. Tabor was incarcerated from November 14, 2005, until May 2008 in Connecticut.

43. Mr. Tabor spoke to Ms. Hassan and Aneesha frequently while he was incarcerated in Connecticut.

44. On or about May 2008, Mr. Tabor returned to New York where he moved back into his mother's house located at 188-25 Keesevile Avenue, St Albans, NY. Ms. Hassan was still living there at this time.

45. On or about March, 15, 2009, Ms. Hassan decided to move out of Mr. Tabor's apartment at 188-25 Keesevile Avenue.

46. Mr. Tabor helped Ms. Hassan move into a new apartment in Ozone Park, Queens County.

**Aneesha Makes a Patently False Allegation of Rape & The NYPD Under the Supervision of the QCDAO Fail to Conduct a Full & Proper Investigation**

47. On March 22, 2009, Aneesha made a verifiably false allegation that on November 15, 2005, Mr. Tabor raped her.

48. Aneesha was interviewed by Detective Ropenus and Detective PO Singletary.

49. Aneesha informed them that she was alone in the apartment with Mr. Tabor on the day in question.

50. Aneesha informed Detective Ropenus and PO Singletary that her mother, Ms. Hassan, was working that day.

51. Aneesha stated that she screamed during the incident.

52. Aneesha stated that Mr. Tabor allegedly put his hand over her mouth and said "Go ahead, yell. Nobody will hear you."

53. Aneesha stated that she was absolutely certain that this was the last day that Mr. Tabor was at home before he got arrested.

54. Aneesha told detective Ropenus and PO Singletary that she never liked Mr. Tabor, but that he had bought her expensive birthday presents.

55. Aneesha told Detective Ropenus and PO Singletary that the gold chain and name plate **which she was wearing during this interview** had been given to her by Mr. Tabor.

56. On March 22, 2009, Detective Ropenus and PO Singletary also interviewed Ms. Hassan,

57. Ms. Hassan contradicted Aneesha's story.

58. Ms. Hassan stated that she was definitely at home on the last day before Mr. Tabor was arrested.

59. Ms. Hassan stated that she had numerous interactions with Aneesha on that day.

60. Ms. Hassan's testimony in no way corroborated Aneesha's false allegation.

61. Ms. Hassan did not say that she heard Aneesha scream.

62. Ms. Hassan did not say that Aneesha appeared in any way traumatized or different on that day.

63. On March 25, 2009, Mrs. Tabor, Mr. Tabor and Maggie Jones (Mr. Tabor's niece) and her four young boys were at home at 188-25 Keeseville Avenue, St. Albans, NY at 2030 hours.

64. The lights were on in the house, and there was activity in the house.

65. Detective Ropenus and Detective Aquaviva allege that on March 25, 2009, they went to 188-25 Keeseville Avenue, St. Albans, NY at 2030 hours to speak to Mr. Tabor, but nobody answered the door.

66. On March 26, 2009, Mrs. Tabor, Mr. Tabor and Maggie Jones and her four young boys were at home at 188-25 Keeseville Avenue, St. Albans, NY at 2300 hours.

67. Detective Ropenus and Detective Esposito allege that on or about March 26, 2009, they went to 188-25 Keeseville Avenue, St. Albans, NY at 2300 hours, but there was no sign of any activity in the house.

68. On March 29, 2009, Mr. Tabor and his mother were at home getting ready to attend Sunday services at Tiberian Baptist Church, when Detective Ropenus and Detective

McLaughlin arrived at Mr. Tabor's home and asked him to accompany them to the local NYPD Precinct to talk about Ms. Hassan and Aneesha.

69. Detective Ropenus and Detective McLaughlin failed to obtain a search warrant to inspect the house for any physical evidence, in particular, the bedroom in which the alleged rape took place.

70. Detective Ropenus failed to perform a physical inspection of the interior of the house which would have shown that all noises were audible throughout the house; that the house was tiny; that Aneesha's room was next to Mr. Tabor's room; and that Mrs. Tabor lived on the first floor.

71. Detective Ropenus also failed to establish that Mrs. Tabor was present on the day of the alleged rape.

72. Detective Ropenus and Detective McLaughlin did not ask where Mr. Tabor was on November 15, 2005.

73. Mr. Tabor repeatedly asked the detectives what was wrong with Ms. Hassan and Aneesha, but they did not answer.

74.  At the Precinct, Detective Ropenus informed Mr. Tabor that he was being charged with raping Aneesha.

75. Mr. Tabor was stunned.

76. Mr. Tabor immediately denied the allegation, and asked Detective Ropenus when he had allegedly raped Aneesha.

77. Detective Ropenus said " November 15, 2005."

78. Mr. Tabor told Detective Ropenus, "That's impossible! I was in jail in Connecticut!"

79. Detective Ropenus responded "No. You were in New York raping Aneesha Hassan"!

80. The only evidence supporting this charge was the testimony of one person, whose statement was verifiably false and who had a motive to lie.

81. The testimony was contradicted by the only other person interviewed by the NYPD under the supervision of the QCDAO – the complaining witnesses' mother.

82. Detective Ropenus' investigation was incomplete and woefully inadequate.

83. Detective Ropenus and Detective McLaughlin did not investigate as to whether anybody else was in the house at that time of the alleged rape.

84. Detective Ropenus failed to establish that Mrs. Tabor also lived at 188-25 Keeseville Avenue, and was in the house at the time of the alleged rape.

85. Detective Ropenus never interviewed Mrs. Tabor.

86. Detective Ropenus and Detective McLaughlin failed to conduct an interview of Fatima Hassan, Aneesha's cousin, and Wahida Hassan, Aneesha's aunt, whom Aneesha was living with at the time when she made the allegation.

87. Aneesha had allegedly informed Fatima and Wahida about the alleged rape nine months earlier.

88. Detective Ropenus and Detective McLaughlin failed to thoroughly investigate the testimony of Aneesha.

89. Detective Ropenus and Detective McLaughlin failed to make inquiries as to why Aneesha continued to wear a necklace and nameplate that had been given to her by Mr. Tabor even though she alleged that he raped her.

90. Detective Ropenus and Detective McLaughlin failed to follow up with Aneesha's school teachers and school reports, which would have shown that she consistently skipped class and was under a special program to force her attendance at school.

91. Detective Ropenus and Detective McLaughlin failed to conduct a through investigation of Mr. Tabor, which would have shown that he was incarcerated on the date on which the Criminal Complaint alleged that Mr. Tabor raped Aneesha.

92. Detective Ropenus and Detective McLaughlin failed to obtain Mr. Tabor's Incarceration Records from Connecticut.

93. Detective Ropenus and Detective McLaughlin failed to fully investigate the relationship between Mr. Tabor and Aneesha, which would have shown that Aneesha resented Mr. Tabor for attempting to introduce discipline in her life and for preventing her from staying out late.

**94. Detective Ropenus and Detective McLaughlin failed to investigate why Aneesha's Mother continued to live with Mr. Tabor for nine months after Aneesha had informed her Mother that Mr. Tabor had allegedly raped her.**

95. Detective Ropenus and Detective McLaughlin failed to fully investigate the case despite the fact that there was no physical evidence and the time lag of almost four years between the alleged rape and the allegation being made.

96. Detective Ropenus' incomplete and woefully inadequate investigation was not properly overseen by the QCDAO.

**Waiver 1: The QCDAO Refuse to Conduct a Full and Proper Investigation Because Mr. Tabor Refuses to Agree to the QCDAO "Pre-Arraignment Waiver"**

97. As a matter of practice and policy, the QCDAO conducts pre- arraignment interviews of defendants, which are known as the Central Booking Interview Program.

98. As a matter of policy and practice, the QCDAO refuse to conduct proper investigations of cases where the defendant does not consent to such an interview by waiving their 5th Amendment constitutional right to remain silent ("pre-arraignment waiver").

99. Mr. Tabor was informed by the Assistant District Attorney of the QCDAO and accompanying NYPD Police Officers "if there is something you would like us to investigate concerning this incident, you must tell us now so that we can look into it".

100. Mr. Tabor refused to agree to the pre-arraignment waiver and exercised his Fifth Amendment right to remain silent.

101. Because Mr. Tabor refused to sign this pre-arraignment waiver, the QCDAO deliberately failed to conduct a proper and full investigation of Mr. Tabor's case or to properly supervise the full and thorough investigation of Mr. Tabor's case through the NYPD.

## Waiver 2: The QCDAO Fails to Conduct an Investigation Because Mr. Tabor Refuses to Sign the QCDAO "Arraignment Waiver"

102. Since Mr. Tabor could not afford an attorney, he was assigned counsel pursuant to New York City Law 18 b.

103. Mr. Eugene Guarino, Esq. ("Mr. Guarino"), who is a member of the Queens County 18 b criminal defense panel, was assigned to represent Mr. Tabor.

104. Mr. Guarino is a former Queens County Assistant District Attorney.

105. Mr. Tabor immediately demanded of Mr. Guarino that they "fight this the whole way cause I ain't done a thing."

106. Mr. Tabor informed Mr. Guarino "I was in jail in Connecticut on November 15, 2005".

107. On or about March 29, 2009, Mr. Tabor, represented by Mr. Guarino, appeared in Queens County Criminal Court for his arraignment.

108. The QCDAO has a practice and policy of asking defendants facing felony charges to waive their rights under New York Criminal Procedure Law Section 180.80 and 30.30, respectively, (arraignment waiver) in order to gain more time to investigate their case.

109. The QCDAO has a practice and policy of refusing and failing to conduct proper investigations and supervise the NYPD's investigation of cases where defendants refuse to sign the arraignment waiver.

110. Mr. Tabor refused to sign the arraignment waiver.

111. As a result of not signing the arraignment waiver, the QCDAO, specifically, ADA Parson, ADA Fisher, ADA Applebaum, ADA Espinal, Detective Ropenus, and Detective McLaughlin failed to examine a patently false allegation.

112. The QCDAO failed to investigate the contradictions in Aneesha's testimony; failed to investigate the relationship between Aneesha and Mr. Tabor; failed to interview all witnesses who had or may have had knowledge of the incident; failed to obtain a search warrant to inspect the scene of the alleged rape; and failed to investigate Mr. Tabor's whereabouts on the day of the alleged rape.

113. The Criminal Complaint, dated March 29, 2009, charges Mr. Tabor with first degree rape of a minor on or about November 15, 2005.

114. Mr. Guarino told the Judge at Mr. Tabor's arraignment that Mr. Tabor was incarcerated on November 15, 2005, therefore, the criminal court complaint, which alleged that the rape took place on November 15, 2005, was false.

115. Mr. Guarino pointed out to the Judge that there was a four-year time lag from the alleged date of the rape until the allegation was made.

116. Mr. Guarino pointed out to the Judge that there was no supporting evidence, physical or testimonial, apart from the verifiably false allegation.

117. The Judge adjourned the case for a "second call" and asked the People to determine whether the defendant had been incarcerated on that date.

118. On or about March 30, 2009, at second call, the People failed to verify whether Mr. Tabor had been incarcerated.

119. Mr. Tabor was arraigned and bail was set extremely high - $200,000.00.

120. Mr. Tabor clearly did not have the financial resources to meet such a high bail demand.

121. It is harder for the attorney of a defendant - and common knowledge among criminal law attorneys - to negotiate with the QCDAO, when the defendant is incarcerated.

122. Mr. Guarino contacted the QCDAO on or about Monday, March 30, 2009, and informed them that Mr. Tabor was incarcerated on November 15, 2005.

123. Mr. Guarino was able to speak with Mr. Tabor's Parole Officer and obtain hard copies of Mr. Tabor's Connecticut incarceration records in less than three days.

124. These records document that Mr. Tabor was incarcerated in Connecticut on November 15, 2005.

125. Mr. Guarino spoke with Mr. Tabor's parole officer.

126. On or about April 3, 2009, Mr. Guarino appeared in Queens County Criminal Court for Mr. Tabor's appearance before a Grand Jury.

127. On arriving at Queens County Criminal Court, ADA Fisher and ADA Applebaum asked Mr. Guarino to meet with them.

128. ADA Fisher and ADA Applebaum asked Mr. Guarino about 'the issue of the date'.

129. Mr. Guarino presented ADA Fisher and ADA Applebaum with records of Mr. Tabor's incarceration in Connecticut on November 15, 2005. Mr. Guarino also highlighted the time lag between the alleged incident and the allegation being made to the police, and the fact that there was no physical evidence implicating Mr. Tabor.

130. Once again, ADA Fisher and ADA Applebaum asked that Mr. Tabor sign the standard QCDAO arraignment waiver, which waives a defendant's 180.80 and speedy trial rights, in order to provide the QCDAO with more time to *inter alia* investigate the case.

131. The QCDAO has a practice and policy of asking defendants facing felony charges to waive their rights under New York Criminal Procedure Law Section §180.80 and §30.30, respectively, in order to *inter alia* force a plea-bargain and gain more time to investigate their case.

132. The QCDAO has a practice and policy of refusing to conduct proper investigations of cases where defendants refuse to sign the arraignment waiver.

133. Mr. Tabor did not sign the arraignment waiver.

134. As a result of not signing the arraignment waiver, the QDCAO and NYPD, specifically, ADA Parsons, ADA Fisher, ADA Applebaum, ADA Espinal, Detective Ropenus, and Detective McLaughlin did not investigate Mr. Tabor's case in a collective bad faith effort.

135. After the meeting with ADA Applebaum and ADA Fisher, Mr. Guarino approached ADA Espinal and explained that Mr. Tabor could not have committed the rape on November 15, 2005 as he was incarcerated.

136. Ms. Espinal informed Mr. Guarino that 'the date' was not an element of the crime that she needed to prove.

137. Later that day and prior to the case being presented to the Grand Jury, Mr. Guarino met ADA Parsons and once again pointed out that Mr. Tabor could not have committed the rape since he was incarcerated on November 15, 2005.

138. ADA Parsons informed Mr. Guarino that the complaining victim had been "re-interviewed and that the date had changed."

139. ADA Parsons elicited testimony in the Grand Jury that changed the date of the alleged rape from November 15, 2005, to November 13, 2005.

140. The Grand Jury indictment states that Mr. Tabor allegedly raped Aneesha on or about November 13, 2005.

141. Mr. Tabor was indicted on the rape of Ms. Aneesha Hassan on or about April 3, 2009 following the Grand Jury indictment.

142. At the Supreme Court arraignment of Mr. Tabor, Mr. Guarino once again asked for a full investigation of Mr. Tabor's case.

143. In response to Mr. Guarino's request, Mr. Tabor was informed, in sum and substance, "Save it for the Jury!"

144. ADA Parsons told Mr. Guarino that their 'offer' is 10 years without probation, and stated that the date is not an element of the crime that needs to be proven.

145. On all subsequent court dates prior to the trial of Mr. Tabor in March 2010, Mr. Guarino asked for a full investigation of Mr. Tabor's case.

146. Mr. Guarino was repeatedly told "Save it for the Jury!"

147. Upon information and belief, the only investigation of Mr. Tabor's case carried out by the defendants were the two interviews conducted by Detective Ropenus on or about March 22, 2009, which resulted in contradictory testimony.

148. Mr. Tabor's mother, who was undisputedly in the house on the day of the alleged rape, was never interviewed by the NYPD or the QCDAO.

149. Aneesha Hassan's aunt who, it is alleged, was told by Aneesha Hassan that she had been raped by Mr. Tabor, was never interviewed by NYPD or the QCDAO.

150. The only evidence against Mr. Tabor was the testimony of a fifteen year old, whose testimony was verifiably false.

151. The QCDAO and NYPDs' reliance on blatantly implausible and unbelievable testimony was patently unreasonable and constitutes bad faith.

152. The subject of a girl making false accusations against a male family member out of spite has been the subject of a prize winning novel, and an Oscar nominated movie: "Atonement".

153.  On or about Monday October 17, 2010, Justice Sotomayor, whilst discussing the film "12 Angry Men", stated "[t]he job of the prosecutor is not merely to convict people, but also to investigate thoroughly beforehand to ensure the defendant's guilt". NY Times, Monday October 18, 2010.

154.  On March 19, 2010, a trial against Mr. Tabor commenced.

155.  On March 26, 2010, after just four hours of deliberation Mr. Tabor was acquitted of all charges.

156.  Mr. Tabor was released after spending more than one year in Riker's accused of rape.

157.  While an inmate at Rikers, accused of raping a minor, Mr. Tabor suffered what is best described as 'a living hell'.

158.  Inmates accused of sex crimes, particularly those accused of pedophilia, are subjected to ridicule, verbal and physical abuse, and constantly humiliated by other inmates.

159.  Mr. Tabor suffered substantial injuries, losses and damage as a result of his false arrest and malicious prosecution, including but not limited to: loss of freedom, loss of enjoyment of life, loss of friends, loss of his family's company during his incarceration, psychological injury caused by his lengthy incarceration, physical suffering, mental anguish, emotional distress, depression, sleep disturbance, shame, embarrassment, humiliation, damage to his reputation, loss of earnings/pecuniary loss.

160. Mrs. Tabor suffered the loss of her son's physical, emotional and financial support which exacerbated her existing medical condition and was the source of much stress to Mr. Tabor.

## FIRST CAUSE OF ACTION

### (42 USC 1983 – False Arrest)

161. Plaintiff Mr. Tabor repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

162. Defendants have deprived plaintiff of his civil, constitutional and statutory rights under color of law and are liable to plaintiff under 42 USC 1983.

163. Defendants have deprived plaintiff of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, in that plaintiff was arrested by Detective Ropenus without legal justification, in that Detective Ropenus carried out an incomplete and woefully inadequate investigation of the allegations made against plaintiff, and in that the QCDAO refused, in bad faith, to conduct a full and proper investigation because plaintiff exercised his constitutional rights in refusing to sign the pre-arraignment waiver.

164. In short, the defendants knew or should have known that they did not have probably cause for an arrest and detention of plaintiff.

165. The defendants unreasonably and unjustifiably confined plaintiff.

166. Plaintiff was aware of, and did not consent to, his confinement.

167. The confinement was not privileged.

168. Plaintiff has been damaged a result of defendants' actions in an amount believed to equal or exceed $5,000,000.00.

## SECOND CAUSE OF ACTION

### (42 USC 1983 – Malicious Prosecution)

169. Plaintiff Mr. Tabor repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

170. Defendants have deprived plaintiff of his civil, constitutional and statutory rights under color of law and are liable to plaintiff under 42 USC 1983.

171. Defendants have deprived plaintiff of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and his right to be free from bad faith prosecutions, in that plaintiff was prosecuted by the defendants without legal justification, in that the QCDAO refused in bad faith to conduct a proper investigation or to supervise the NYPD's investigation of the case because plaintiff exercised his constitutional right not to sign the arraignment waiver.

172. In short, the defendants have acted in bad faith and with malice, in that they refused to properly investigate the circumstances of the case.

173. The defendants knew or should have known that they did not have probable cause for the detention and prosecution of plaintiff.

174. The malicious prosecution was initiated by the defendants, in that the defendants caused the commencement and continuation of criminal proceedings against the plaintiff.

175. The proceedings terminated in favor of the plaintiff.

176. Plaintiff has been damaged a result of defendants' actions in an amount believed to equal or exceed $5,000,000.00.

## THIRD CAUSE OF ACTION

### (Constitutional Tort)

177. Plaintiff Mr. Tabor repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

178. The defendants acting under color of law, violated plaintiff's rights pursuant to Sections 6 and 12 respectively of the New York State Constitution.

179. A damages remedy is necessary here to enforce the purposes of Sections 6 and 12 of the New York State Constitution, and ensure the full realization of plaintiff's rights under those sections.

180. Defendants have deprived plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under the New York State Constitution in an amount believed to equal or exceed $5,000,000.00

## FOURTH CAUSE OF ACTION

### (42 USC 1983 – Monell Claim)

181. Plaintiff Mr. Tabor repeats and realleges each of the preceding allegations of this Complaint as if fully set forth herein.

182. The City, DA Brown, QCDAO, ADA Applebaum, ADA Fisher, and Police Commissioner Kelly, respectively, were supervisors and final decision makers, and as a matter of policy and practice, have acted in bad faith and with a reckless indifference to plaintiff's rights under the Constitution and laws of the United

States. They are thus liable for the damages suffered by plaintiff as a result of the conduct of the other defendants listed in the complaint in the illegal and wrongful acts detailed above.

183. The City, DA Brown, QCDAO, ADA Applebaum, ADA Fisher, and Police Commissioner Kelly, knew or should have known of the illegal and wrongful practice of refusing to investigate cases properly where an accused person refuses to sign the pre-arraignment waiver and the arraignment waiver. The aforementioned incident was not an isolated incident. The City, DA Brown, QCDAO, ADA Applebaum, ADA Fisher, and Police Commissioner Kelly have been aware for some time (from lawsuits, notices of claim and complaints filed with the Civilian Complaint Review board as well as newspaper articles in the NY Times, New York Post, Daily News, ABC News) that these waivers constitute a practice that promulgates and promotes the false arrest and malicious prosecution of law abiding citizens without legal justification and in bad faith.

184. The City, DA Brown, QCDAO, ADA Applebaum, ADA Fisher, and Police Commissioner Kelly have failed to take the steps necessary to correct the improper and illegal use of these waivers, and as a result have damaged plaintiff in an amount believed to equal or exceed $5,000,000.00.

### FIFTH CAUSE OF ACTION

(Loss of Familial Relationship)

185. Plaintiffs repeat and reallege each of the preceding allegations of this Complaint as if fully set forth herein.

186. The defendants through all the actions heretofore pleaded collectively deprived Mr. Tabor of his familial relationship with his mother, Mrs. Tabor, and extended family.

187. They are thus liable for the damages suffered by plaintiff as a result of this conduct.

188. Mr. Tabor suffered severe emotional trauma as a result of this loss of familial relationship.

### JURY DEMAND

Plaintiff demands a trial by jury.

WHEREFORE, plaintiff respectfully requests that the court enter a Judgment against defendants together with costs and disbursements as follows:

In favor of plaintiff in an amount to be determined by a jury, but at least equal or exceeding $5,000,000.00, for each of plaintiffs' respective causes of action;

Awarding plaintiff punitive damages in an amount to be determined by a jury;

Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action;

And such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            January 11, 2010

By:  _____
     Duncan Peterson (DP 7367)

     Peterson Delle Cave LLP
     Attorney for Plaintiff
     233 Broadway, Suite 1800
     New York, NY 10279
     (212) 240-9075