UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JOHN TABOR,

               Plaintiff,

  -against-                        **MEMORANDUM AND ORDER**
                                          Case No. 11-CV-195 (FB) (CLP)

NEW YORK CITY, DETECTIVE JAMES
ROPENUS, DETECTIVE MCLAUGHLIN,
POLICE OFFICER SINGLETARY,
KEISHA ESPINAL, LAUREN PARSONS,
KENNETH APPLEBAUM, MARJORIE
FISHER, RICHARD BROWN, and
POLICE COMMISSIONER RAYMOND
KELLY,

               Defendants.
-------------------------------------------------------x

*Appearances:*
*For the Plaintiff:*
DUNCAN A. PETERSON, ESQ.
Peterson DelleCave, LLP
233 Broadway, Suite 1800
New York, New York 10279

*For the Defendants*:
MICHAEL A. CARDOZO, ESQ.
Corporation Counsel of the City of New York
100 Church Street
New York, New York 10007

By:    MATTHEW J. MODAFFERI, ESQ.
           Assistant Corporation Counsel

**BLOCK, Senior District Judge:**

        In 2009, John Tabor was arrested and charged with rape. Having been acquitted, he now sues the City of New York ("the City") and three officers of the New York City Police Department ("NYPD"): Detective James Ropenus, Detective McLaughlin and Police Officer Singletary.[1] His claims arise under 42 U.S.C. § 1983 and New York law.

---

[1] He also sued Police Commissioner Raymond Kelly, Queens County District Attorney Richard Brown, and four members of the Queens County District Attorney's Office. The Court dismissed those claims on March 14, 2012. *See Tabor v. New York City*,

The City and the three officers move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the motion is granted.

I

The following facts are taken from the parties' 56.1 statements and supporting documentation. They are undisputed or, if disputed, presented in the light most favorable to Tabor. *See Jenkins v. City of New York*, 478 F.3d 76, 85 n.4 (2d Cir. 2007).

## A. Initial Complaint

On March 22, 2009, 19-year-old A.H. and her mother went to the 113th Precinct in Jamaica, Queens. There, A.H. told an officer that she had been raped by Tabor on November 15, 2005. The officer summarized A.H.'s story in a written Domestic Incident Report:

> [A.H.] states that the suspect, John Tabor (her mother's ex-boyfriend) on November 15, 2005 at 2130 hours, told her to take off her pants, when she refused, he took them off, choked her while holding her down and had intercourse with her, penis to vagina—Victim stated she was very fearful of suspect and still is.

Decl. of Matthew J. Modafferi (Aug. 12, 2012), Ex. G. A.H. also gave her own written account of the incident:

> I was in my room laying down watching T.V. and John was also in my room on the computer. Then he walked out for about two minutes, came back and told me to take off my shorts and I refused, so then he began to choke me and say "Yell, go ahead and scream for help." As he was saying those things still with his hand around my neck he forced his private on me. I began to cry but then he said "cry for help" so I

---

2012 WL 869424 (E.D.N.Y. Mar. 14, 2012) (adopting report and recommendation).

stopped crying. After he was done he went into the bathroom and got a wash rag and cleaned me off. Then I started crying again. And as he was walking out my room he looked at me and said—"Stop crying. Don't cry. You asked for it."

*Id.*, Ex. H

The officer sent the women to the Queens Special Victims Squad ("QSVS"), where they were separately interviewed by Ropenus; Singletary was present during both interviews. Ropenus's summary of the interview with A.H. is as follows:

> 1. On March 22, 2009, at approximately 1830 hours PO Singletary and I were present with the C/V [complainant/victim] in the QSVS office. The C/V stated that she was not sure of the exact date of occurrence but she was sure that it was the last day that the subject was home. She stated after the incident he left and was arrested that morning and served two and a half years. She stated she has never seen him since that day. She stated she could not remember that date but that she asked mother and she provided that date.
>
> 2. The C/V stated that the subject grabbed her and pushed her on the bed she stated that her mother was at work. She stated she started to scream and that the subject placed his hand on her throat and choked her telling her to scream, no one will her [sic] you. She stated that the subject then forcibly placed his penis in her vagina and ejaculated on her stomach. She stated that the subject got a wash towel and cleaned her and then while leaving stated "why are you crying you asked for it." She stated the subject left and that her mother came home later and made some small talk. I asked if the C/V mother noticed any marks or asked about her crying and she stated no.
>
> 3. I asked if she was sure it was the day he was arrested and she respond[ed] yes. She stated her mother was working and that she could not remember if she had school or if it was a week end [sic]. I told her the day was a Tuesday and she responded she thought that it was a week end [sic] but she could not be sure.

3

4. When asked for additional information the C/V stated she could not remember. She stated she never liked the subject and that she did not want to be near him. She stated that he had taken her on two trips in his truck and that on at least one of them stated to her that he placed her heard on his privates while she was sleeping. I asked if she did not like him and she thought he was going crazy, why she would travel on overnight trips with him. She responded that he was not so bad and nothing had happened physically before. I asked if he bought her any expensive gifts and she responded only a stereo and a gold chain and name plate which she was wearing. I asked when he purchased them and she stated the birthday before the incident.

*Id.*, Ex. L. His summary of the interview with A.H.'s mother is as follows:

1. On March 22, 2009, at approximately 1915 hours PO Singletary and I were present with the C/V's mother at QSVS. She stated that she was made aware of the incident a few days ago. She stated that her daughter told her that on the day that the subject was arrested he forced her to have sex with her. I asked if she remembered the day and she stated yes. She stated that the subject was acting erratic and refused to let her leave the house. She stated he had ripped down the drop ceiling and told her that someone had dug under the foundation and planted cameras in there [sic] home. She stated that he was acting agitated and would not let her leave. She stated he left and she was called later in the morning and was informed he was arrested. I asked if she was sure about the date and she stated yes. I asked if she spoke to her daughter that day and she stated yes she was home all day.

2. After this I spoke to the C/V and asked if she was sure of the day and she responded yes. I told her that her mother stated she was home and that the subject was interacting with her several times during the day. The C/V stated that it was that day and she was home alone with the subject. I then asked the C/V's mother about that day and she stated she remembered clearly the subject ripped down part of the wall and forced her to stay home.

3. The C/V's mother stated that the subject had mental problems and that she still has contact with the subject. She

4

> stated she asked her daughter several times if anything happened and she was told no. She stated when her daughter moved out she asked if he did anything to her and she responded no he's just crazy and I can't live with him.

*Id.*, Ex. M.

A.H. and her mother told Ropenus that Tabor had been arrested in Connecticut on unrelated charges shortly after the incident, and had served a two-and-a half-year sentence there. However, a search of Tabor's criminal record yielded "negative results." *Id.*, Ex. K. An officer at NYPD's Real Time Crime Center told Ropenus that their system would return results for convictions and pending cases, but not for arrests. Ropenus noted that "there is no record of [Tabor] being arrested in Connecticut." *Id.*, Ex. O.

**B. Arrest**

Immediately after the interviews, Ropenus and another detective went to Tabor's residence, but found no one home. Ropenus returned twice more, each time without success. Ropenus, accompanied by McLaughlin, finally met Tabor at his home on March 29, 2012. Tabor agreed to accompany the officers to QSVS. When informed of A.H.'s complaint against him, Tabor stated, "People try and put a lot of things on me, but I never touched her like that. I will talk to the judge." *Id.*, Ex. T. Tabor made no further statements. At that point, he was placed under arrest.

**C. Criminal Complaint, Indictment and Trial**

Following his arrest of Tabor, Ropenus swore out a criminal complaint:

> Deponent states that he is informed by the complainant, A.H., that . . . the defendant, John Tabor, told her to take her pants

5

> off, but that the complainant refused. Deponent further states that he is informed by the complainant that the defendant grabbed her by the neck and pushed her onto the bed. Deponent further states that he is informed by the complainant that he held her throat making it difficult for her to breathe. Deponent further states that he is informed by the complainant that while the defendant held her by the throat he took off her pants and then inserted his penis inside her vagina.
>
> Deponent further states that he is informed by the complainant that the defendant ejaculated on her stomach then wiped her stomach with a washcloth.
>
> Deponent further states that he is informed by the complainant that she was fifteen (15) years old during the above mentioned incident and that her date of birth is December [REDACTED], 1989.
>
> Deponent further states that the defendant informed him that his date of birth is March [REDACTED] 1956.

*Id.*, Ex. W.

At approximately the same time, Assistant District Attorney Keisha Espinal interviewed A.H. In addition to A.H.'s narrative, Espinal's report includes notations that A.H. told a friend what had happened approximately one month later, and told her aunt what had happened in approximately August 2008. Espinal contacted the friend and the aunt, both of whom confirmed that A.H. had told them she was raped. Espinal's report futher noted that Ropenus was continuing to investigate whether Tabor had been arrested in Connecticut.

Tabor was arraigned on the complaint and the matter was referred to a grand jury. The assistant district attorney assigned to present the case to the grand jury, Lauren Parsons, interviewed A.H., her mother and Ropenus. She also spoke to the aunt and friend

6

(who was possibly A.H.'s cousin) identified in Espinal's report. Parsons was also able to obtain records from Connecticut reflecting that Tabor was incarcerated there on November 15, 2005. As a result, the case was presented to the grand jury on the theory that the rape had occurred on November 13, 2005.

The grand jury returned an indictment charging Tabor with one count of first-degree rape, two counts of third-degree rape, and one count of child endangerment. The child endangerment count was later dismissed, but the rape counts proceeded to trial. Tabor was acquitted on March 26, 2010. He timely filed suit ten months later.

## II

Tabor asserts three claims under 42 U.S.C. § 1983. He asserts claims for false arrest and malicious prosecution against the individual defendants—Ropenus, McLaughlin and Singletart. He then alleges that the City is liable for those constitutional violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Finally, he asserts claims for "constitutional tort and "loss of familial relationship" under state law. The Court addresses those claims in turn.

**A. False Arrest**

*1. Constitutional Violation*

"A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996)). The only difference is "§ 1983's requirement that the tort be committed under color of state law,"*Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991); that requirement that is not in dispute here.

7

"Under New York law, an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Ackerson*, 702 F.3d at 19 (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)). Arrests supported by probable cause are privileged and, thus, the existence of probable cause "is a complete defense to an action for false arrest." *Weyant*, 101 F.3d at 852 (internal quotation marks and citation omitted).

"[P]robable cause to arrest exists when police officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852). "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).

Seizing on *Singer's* caveat, Tabor argues that the circumstances of A.H.'s account called her veracity into question. He focuses on the date of the alleged rape, a date for which his incarceration in Connecticut provided an alibi. But A.H. herself did not stress a specific date. Instead, as Ropenus's summary of her interview reflects, she "was not sure of the exact date of occurrence but she was sure that it was the last day that the subject was home." Modafferi Decl., Ex. L. That Tabor had an alibi for November 15, 2005—a date

supplied by A.H.'s mother—did not raise any doubt about A.H.'s veracity in candidly describing her recollection of the timing of the alleged rape.

Other circumstances, however, might have led a reasonable officer to doubt the truth of A.H.'s allegation. First, A.H. reported the rape more than *three years* after the fact. "Courts applying [*Singer*'s] limitation to the victim/citizen complaint rule have found that the complainant's delay in reporting a crime is a factor for determining the complainant's truthfulness." *Cornett v. Brown*, 2007 WL 2743485, at *6 (E.D.N.Y. Sept. 17, 2007) (collecting cases); *see also Bullard v. City of New York*, 240 F. Supp. 2d 292, 298 (S.D.N.Y. 2003) (holding that delay of "many weeks" raised "questions as to the legitimacy of the complaints that the defendants apparently left unanswered"). Second, A.H. was "sure" that she was "home alone with the subject" at the time of the alleged rape, Modafferi Decl., Ex. L, while her mother "remembered clearly" being home at that time, *id.*, Ex. M.

Finally, A.H. told Ropenus that "she never liked [Tabor] and that she did not want to be near him." *Id.*, Ex. L. "The most common situation in which such doubts arise [about a victim's veracity] is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation." *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998). "When such a relationship exists, and is known to the arresting officer before the arrest is made, the complaint alone may not constitute probable cause; the officer may need to investigate further." *Id.* Judge Gleeson summed up the common sense behind that principle thusly: "Some people have axes to grind." *Id.*

The individual defendants offer several arguments why the circumstances surrounding A.H.'s accusation did not defeat probable cause. With respect to the delay in reporting, they note that such delays are a common occurrence in rape cases. *See, e.g., People v. Rosario,* 17 N.Y.3d 501, 519, 934 N.Y.S.2d 59, 70, 958 N.E.2d 93, 104 (2011) ("It is now well-known that, in many cases, it is difficult for the victim to report the crime or to accuse her attacker. And delayed reporting, often understandable in the case of adult victims, is even more so in the case of children abused by adults."). It is also possible that the discrepancy between the recollections of A.H. and her mother is nothing more than two people describing slightly different time frames, with A.H. placing the rape the evening before Tabor's arrest and her mother describing the events of the following morning. *Cf. Frey v. Maloney*, 476 F. Supp. 2d 141, 153 (D. Conn. 2007) ("It is not unusual for witnesses to criminal conduct to recall details differently or give differing versions of the events."). Finally, defendants argue that A.H.'s admitted dislike of Tabor may have been the understandable result of unwanted sexual advances.

These are all plausible arguments that might persuade a jury that Ropenus's decision to credit A.H.'s statements was a reasonable one. However, taking the record in the light most favorable to Tabor, the Court cannot make that conclusion as a matter of law.

## 2. Qualified Immunity

"The doctrine of qualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady*, ___ F.3d ___, 2013 WL 4528864, at *3 (2d Cir. Aug. 28, 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S.

10

800, 818 (1982)). Since the right to be free from arrest without probable cause is clearly established, the qualified immunity inquiry in false arrest cases "turns on whether the officers' probable cause determination was objectively reasonable." *Id.* "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Jenkins v. City of New York*, 478 F.3d 76, 86-87 (2d Cir. 2007) (quoting *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir. 1995)).

The Court has held that reasonable officers could disagree as to whether A.H. was credible. While that holding precluded summary judgment as to *actual* probable cause, it compels a finding of *arguable* probable cause. As a result, the individual defendants are entitled to qualified immunity. *Accord Nabatkhorian v. County of Nassau*, 2013 WL 1233247, at *9 (E.D.N.Y. Mar. 27, 2013) ("Although, as Plaintiff argues, a delay in reporting the crime may affect the probable cause determination, . . . the Court finds that reasonable officers could disagree over whether an alleged victim's failure to promptly report that her husband raped her defeats probable cause[.]").

**B. Malicious Prosecution**

As with false arrest, the existence of probable cause defeats a claim of malicious prosecution under § 1983. *See Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) ("[I]f there was probable cause for the prosecution, then no malicious prosecution claim can stand."). Moreover, in the context of malicious prosecution, "[a] presumption

11

of probable cause is created . . . by a grand jury's indictment." *Id.* at 76.[2] The presumption is rebuttable and can be overcome if the plaintiff "establish[es] that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983)).

In an attempt to overcome the presumption created by his indictment, Tabor cites two instances of what he calls "bad faith." First, he argues that A.H. altered her testimony regarding the date of the incident. But a *victim's* alteration of his or her testimony does not constitute *police* conduct. *Cf. McClennan v. Smith*, 439 F.3d 137, 146 (2d Cir. 2006) (citing inconsistencies and omissions in *police officer*'s statements as evidence of bad faith).[3] In any event, the date discrepancy is, as explained above, illusory; A.H. claimed that Tabor raped her on the day before his arrest in Connecticut, but was candidly uncertain about the precise date.

Second, Tabor argues that Ropenus's investigation of A.H.'s allegation amounted to "gross incompetence," and, as such, "demonstrates that his actions were undertaken in bad faith." Pl.'s Mem. of Law at 17. Time and again, however, the Second Circuit has held that probable cause, whether to arrest or prosecute, does not require an officer to undertake any investigation at all. *See Panetta v. Crowley*, 460 F.3d 388, 395-96 (2d

---

[2]"[T]he presumption of probable cause arising from an indictment 'applies only in causes of action for malicious prosecution and is totally misplaced when applied in false [arrest] actions.'" *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)).

[3]Of course, alterations in a victim's testimony might be the result of police conduct, but there is no evidence that any of the individual defendants coerced, enticed, or otherwise influenced A.H.

Cir. 2006) ("[A] officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."); *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) ("The officer was not required to make a full investigation into plaintiff's state of mind prior to taking action."); *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) ("'It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon' the situation." (quoting *United States v. Manley*, 632 F.2d 978, 984 (2d Cir.1980))). Of course, if the facts known to the officer do not establish probable cause, then the decision not to investigate further is taken at his or her peril; but the resultant tort liability stems from the lack of probable cause, not the failure to investigate.[4]

In sum, Tabor's attempt to rebut the presumption of probable cause fails. So too, then, his claim for malicious prosecution.

## C. *Monell*

Under *Monell*, "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom,

---

[4]That the Court does not challenge Tabor's use of the phrase "gross incompetence" does not imply agreement with his characterization of Ropenus's actions. It is an unfortunate reality that many claims of sexual assault will reduce themselves to a "he said, she said" situation. "It is up to the factfinder to determine whether a defendant's story holds water, not the arresting officer." *Krause*, 887 F.2d at 372.

policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Id.*

Tabor alleges that he refused to sign a "pre-arraignment waiver" of his right to remain silent during his interview with ADA Espinal. Compl. ¶ 100. He further alleges that he refused to sign an "arraignment waiver" of his speedy trial rights at his arraignment. *Id.* ¶ 110. Finally, he alleges that the City maintains an "illegal and wrongful practice of refusing to investigate cases properly where an accused person refuses to sign the pre-arraignment waiver and the arraignment waiver." *Id.* ¶ 183.

As noted, a municipal policy must cause an underlying constitutional violation to be actionable under *Monell*. *See also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (explaining that *Monell* "*extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."). Since the Court has held that the prosecution against Tabor did not violate his constitutional rights, the policy he alleges—even assuming that it exists—does not give rise to liability under *Monell*. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[None] of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.").[5]

---

[5]Although the Court has held that there is a jury question as to probable cause for Tabor's *arrest*, the arrest cannot, as a matter of logic, have been motivated by a policy pertaining to post-arrest events.

14

**D. State-Law Claims**

New York law requires that a plaintiff file a notice of claim before suing a municipality or its employees for state-law torts. *See* N.Y. Gen. Mun. L. § 50-e. The notice must be filed within ninety days of the incident giving rise to the claim. *See id.* § 50-e(1)(a). Suit must be then be filed within one year and ninety days of the incident. *See id.* § 50-i(1)(c).

Tabor does not dispute that he failed to comply with these requirements. Instead, he argues that the damages for his claim of "loss of familial consortium" are also an element of damages recoverable on his § 1983 claims. While the Court agrees, *see, e.g., Thomas v. Kelly*, 903 F. Supp. 2d. 237, 262 (S.D.N.Y. 2012) ("An individual subjected to a false arrest is entitled to two types of compensatory damages: (1) for loss of liberty and (2) for physical and emotional distress."), the fact remains that Tabor cannot assert a standalone claim for the loss under New York law. His claim of "constitutional tort" is similarly barred.

### III

For the foregoing reasons, the motion for summary judgment is granted in all respects. The Clerk shall enter judgment dismissing the complaint.

**SO ORDERED.**

    /S/ Frederick Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 6, 2013